UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE ESTATE OF JESSE GOODE,
by and through the Personal Representative,
KELLEY COLLETT,

                Plaintiff,

                                                 Case No. 12-10340

                                                 Paul D. Borman

v.                                              United States District Judge

COUNTY OF GENESEE, *et al.,*

                Defendants.

_____/

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF NO. 88)

      Before the Court is Defendants' Motion for Summary Judgment. (ECF No. 88.) Plaintiff

filed a Response (ECF No. 92) and Defendants filed a Reply (ECF No. 94). The Court held a

hearing on January 8, 2015 and subsequently permitted the individual Defendants to file

supplemental briefing on the issue of qualified immunity. (ECF No. 98, January 30, 2015 Order

Permitting the Individual Defendants Remaining in the Case, *i.e.* Deputy Berlanga, Deputy Van

Woert and Sergeant Nuckolls, to File Supplemental Briefing.)[1] In response to the Court's January

---

[1] In its January 30, 2015 Order, the Court applied the "course of proceedings" test and determined that, although not named in their individual capacities, the individual officers remaining in the litigation, Van Woert, Berlanga and Nuckolls, were on notice that the Plaintiff sought to hold them personally liable. Each of the other named individual Defendants was dismissed by Stipulated Order on October 3, 2014. (ECF No. 95, Stipulated Dismissal.) The Court permitted supplemental briefing on the issue of qualified immunity, a defense which each of the remaining Defendants had asserted in Answer to Plaintiff's Complaint but none had briefed on summary judgment. *See Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (en banc) (holding that failure to explicitly state whether a defendant is sued in his "individual capacity" is "not fatal if the course of

30, 2015 Order, Defendants filed a supplemental brief (ECF No. 99), Plaintiff filed a supplemental response (ECF No. 100), and Defendants filed a supplemental reply (ECF No. 101).[2]  The Court, having heard oral argument and considered the parties' briefing, GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment.

**INTRODUCTION**

This case is about the in-custody death of an inmate at the Genesee County Jail.  Plaintiff's decedent, Jesse Goode, was incarcerated at the Genesee County Jail on a 180-day sentence for a repeat drinking and driving offense.  On April 16, 2011, Goode became ill in his cell and died at a hospital late that day from an apparent heroin overdose.  Plaintiff's estate now brings this suit seeking to recover money damages from Genesee County for failure to have in place appropriate policies that they allege could have prevented Goode's death, and/or for failing to adequately train jail personnel on those policies, and seeking damages from the individual jail personnel for deliberate indifference to Goode's medical needs and for demonstrating gross negligence in response to Goode's medical distress.

**I.      BACKGROUND**

Viewing the facts in the light most favorable to the Plaintiff, the following events occurred at the Genesee County Jail on the afternoon of April 16, 2011.  At around 2:30 p.m. that afternoon, Goode informed fellow inmate Eric Loften that he was not feeling well.  (Pl.'s Resp. Ex. 3, Loften

_____

proceedings otherwise indicates that the defendant received sufficient notice"); *Garcia v. Dykstra*, 260 F. App'x 887, 894-95 (6th Cir. 2008) (applying the course of proceedings test and finding sufficient notice where the complaint sought money damages from the individual defendants and the defendants asserted qualified immunity as an affirmative defense).

[2]  Defendants sought leave to file a sur-reply brief to Defendants' supplemental reply, which the Court DENIES.  (ECF No. 102, Motion for Leave to File Sur Reply Brief.)

Affidavit.) At around 2:40 or 2:45, Goode asked the deputy on shift, Peter Alfarno, if he could take a shower because he was not feeling very well. (Defs.' Mot. Ex. 2, Alfarno Dep. 17-18.) Deputy Alfarno testified that he asked Goode if he was "not feeling very well" meaning anything serious or just as in he needed to take a shower. *Id*. at 18. Goode responded that he just wanted to jump in the shower. *Id*. Maybe ten minutes later, Goode exited the shower and Alfarno observed him walking from the shower with a towel draped around his shoulders and "looked him straight in the eye" and asked "how are you feeling" and "do you want me to call a nurse." *Id*. at 18-19. Goode replied, "pfft, no, I'm feeling fine. I'm just going to go lie down in my cell." *Id*. at 19. Alfarno guessed that he last spoke with Goode at about 2:50, just before the end of his shift. *Id*. at 20. Alfarno testified that he did not inform Deputies Berlanga and Van Woert, who came on in the next shift, that anything was wrong with Goode because he had declined medical attention and never stated to Alfarno that he would be unable to perform his work duties the remainder of the day. *Id*. at 22.

Deputy Kimberly Van Woert came on the shift following Alfarno's shift, along with Deputy Berlanga. (Defs.' Mot. Ex. 4, Van Woert Dep. 13.) She was not informed of Goode's condition by departing deputy Alfarno but, shortly after she came on shift at 3:00 p.m., Goode's cell mate, Deshawn Howard, came to Van Woert and Berlanga to inform them that Goode was not feeling well and was going to lie down and was not going to be able to perform his housing worker duties that afternoon/evening. *Id*. at 18. Van Woert testified that she had seen Goode walk out of the shower and back to his cell but did not have a conversation with him. *Id*. at 21, 25-26. Van Woert then went down to booking and did not return to Goode's pod until the Code Blue on Goode was called later that afternoon. *Id*. at 27.

3

When Deputy Berlanga arrived on the floor, Goode was in the shower and Berlanga watched Goode walk out of the shower, with a towel over his shoulder and drying his hair.  (Defs.' Mot. Ex. 5, Berlanga Dep. 27.)  Berlanga testified, as did Van Woert, that shortly after coming on shift, right around 3:00 p.m., Deshawn Howard approached them and told them that Goode was not feeling well and was "hot and burning up," which Berlanga took to mean that Goode had a fever.  *Id*. at 27. Berlanga testified that Howard stated that Goode could not perform his housing work duties.  *Id*. at 29.  At 4:15 p.m. Berlanga completed a routine cell check of the entire pod, including Goode's cell and observed Goode lying on his back "sleeping just like everyone else."  *Id*. at 40-41.

Berlanga testified that around that same time, shortly after the cell check, Goode's cell mate, Deshawn Howard, came up to Berlanga and said "Jesse's not looking good.  He's making some type of gurgling sounds.  Type of heavy snoring or gurgling, you know.  And there is some white foam coming out the side of his mouth."  *Id*. at 47-48.  Berlanga testified that in response to this information from Howard, he got up and went down to the cell and found Goode lying on his top bunk, breathing and pale looking, and was unable to rouse him.  *Id*. at 48-49.  Berlanga then called the Code Blue by radio while standing in Goode's cell.  *Id*. at 50.  Berlanga said it was only about "25 seconds" after he reached the cell and before he called the code.  *Id*. at 52.

Berlanga's testimony as to the timing of these events is contradicted by the Affidavits of Goode's fellow inmates Eric Loften and Richard Short, both of whom testified that it took repeated requests, and between 5 and 7 minutes, before Berlanga even responded down to Goode's cell after being informed that Goode's color was not looking good, that he was making gurgling sounds and, according to Berlanga, that white foam was coming out of his mouth.  (Pl.'s Resp. Ex. 3, Affidavit of Eric Loften ¶¶ 7-9; Ex. 19, Sworn Affidavit of Richard Short ¶¶ 10-11.)  Loften testified that he

4

approached Berlanga along with Deshawn Howard the first time and told Berlanga at that time that Goode's "color was bad and he was making gurgling noises." Loften Aff. ¶¶ 8-9. Loften testified that it was 5-7 minutes before Berlanga actually responded after having been asked "repeatedly" to check on Goode's condition. *Id.* ¶ 10. Short testified that he both heard and observed Deshawn Howard approach Berlanga at approximately 4:00 p.m. to ask him to check on Jesse and observed and heard Howard go back Berlanga five minutes later and ask, "Aren't you going to go check on Jesse?" (Pl.'s Resp. Ex. 19, Short Aff. ¶¶ 10-11, 13.) Short testified that he kept a timeline to document the delays in getting medical help to Goode and that the jail twice confiscated his timeline. (Short Aff. ¶¶ 16-18.) The County denied possession of such documents in discovery. (Pl.'s Resp. Ex. 20.)

Nurse Thomas and several other deputies, later joined by Sergeant Nuckolls, responded to the Code Blue at approximately 4:30 p.m. (Pl.'s Resp. Ex. 9, Thomas Affidavit ¶ 2.) Nursing services records show that the Code Blue was called at 4:25 p.m. and that at that time, Sgt. Nuckolls called dispatch for an ambulance. (Pl.'s Resp. Ex. 7.) Nuckolls called for 911 to be dispatched a second time after arriving at Goode's cell. (ECF No. 88-7, Nuckolls's Answers to Interrogatories, No. 12, pp. 4-5; ECF No. 88-8, Nuckolls Dep. 9-10.) Goode was taken down from his bunk, CPR was begun and Nurse Thomas asked the deputies "in a forceful voice more than six times for 911 to be called before 911 was finally called." *Id.* ¶ 5. Thomas testified that it was more than seven minutes between the time that jail personnel responded to the Code Blue and the call was finally placed to 911. *Id.* ¶ 7. The call sheet from the Flint Fire Department shows they dispatched a unit at 4:36, arrived on the scene at 4:40 and were tending to Goode at 4:42. (Pl.'s Resp. Ex. 8.) Nurse Thomas testified that Goode was still breathing during this time. *Id.* ¶ 7. After several minutes of

5

CPR, Nurse Thomas called for the defibrillator cart which was brought in but was not in working condition and was unable to be used. *Id.* ¶ 8-10. Following the incident, Nurse Thomas was disciplined for yelling at the deputies more than six times to call 911 to Jesse Goode's aid. *Id.* ¶ 11.

EMS gave further CPR along with NARCAN at 4:48 and Epinephrine at 4:52, once the diagnosis of a drug overdose had been made. (Pl.'s Resp. Ex. 8, Flint Fire Department Prehospital Care Report.) Goode was transported by ambulance to Hurley Hospital and pronounced dead at 5:07 p.m. (Pl.'s Resp. Ex. 11, Genesee County Medical Examiner's Report.) The cause of death was heroin intoxication.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)

(quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 324. "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). In doing so, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth

7

specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial. . . . In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex*, 477 U.S. at 323-34.

## III.    ANALYSIS

### A.    Plaintiff's Claims Under 42 U.S.C. § 1983 Against the Individual Defendants

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S.

42, 48 (1988). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In determining whether the government officials in this case are entitled to qualified immunity, we ask two questions: First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff has shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Phillips v. Roane County, Tenn*., 534 F.3d 531, 538-39 (6th Cir. 2008). All facts and factual inferences are drawn in favor of the nonmovant. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). Here the issue is whether Plaintiff has created a genuine issue of material fact as to whether a constitutional violation has occurred such that the individual Defendants should be denied the defense of qualified immunity.

Plaintiff alleges that Defendants Van Woert, Berlanga and Nuckolls violated rights secured by the Eighth Amendment which "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty*., 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The test for determining whether an officer was deliberately indifferent has both a subjective and an objective component. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). "Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that 'an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'" *Id*. at 703 (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)) (emphasis in

9

original). The objective component is satisfied if the plaintiff alleges that the medical need at issue is "sufficiently serious." *Id*. at 703 (quoting *Farmer*, 511 U.S. at 834). "[A] medical need is objectively serious if it is one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore*, 390 F.3d at 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990) (emphasis in original). "'[C]ases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem [whereas] delay or even denial of medical treatment for superficial, nonserious physical conditions does not constitute a [constitutional] violation.'" *Blackmore*, 390 F.3d at 897 (quoting *Hill v. Dekalb Reg'l Youth Det. Center*, 40 F.3d 1176, 1187-88 (11th Cir. 2004) (first alteration added)).

The Sixth Circuit has held that "[t]his 'obviousness' standard for determining a serious medical need is distinct from a separate branch of Eighth Amendment decisions where the seriousness of a prisoner's medical needs 'may *also* be decided by the *effect* of delay in treatment.'" *Blackmore*, 390 F.3d at 897 (quoting *Hill*, 40 F3d at 1188) (emphasis in original). In a "delay of treatment" case, a plaintiff may establish the objective component, *i.e.* that the deprivation he suffered was "sufficiently serious," by presenting evidence of the effect of a delay in treatment. *Napier v. Madison County, Ky*., 238 F.3d 739, 742 (6th Cir. 2001). Under the delay of treatment approach, at least as to minor or nonobvious ailments, "'[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed.'" *Id*. (quoting

10

*Hill*, 40 F.3d at 1188.

While *Napier* requires evidence substantiating the effects of the alleged delay in treatment where the prisoner's affliction is seemingly minor or non-obvious, "*Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers." *Blackmore,* 390 F.3d at 898.   Where the claim involves a minor malady, "medical proof is necessary to assess whether the delay caused a serious medical injury."   *Id.*   However, where the seriousness of the prisoner's need is obvious even to a lay person, the delay alone satisfies this aspect of the objective component:

> Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise. This violation is not premised upon the "detrimental effect" of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm. When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity.   In such cases, the effect of the delay goes to the extent of the injury, not the existence of a serious medical condition.

390 F.3d at 899.   A plaintiff in such a case is relieved of the burden of establishing that the delay proximately caused his injuries.   *See Scozzari v. Miedzianowski*, 454 F. App'x 455, 464 n. 8 (6th Cir. 2012) (noting that in delay-of-treatment cases involving obvious serious medical needs, "it is not necessary to show that the delay in providing medical care proximately caused the injury" and holding that in such a case "the delay alone . . . creates a substantial risk of serious harm") (citing *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005) (quoting *Blackmore*, 390 F.3d at 899) (alteration in original);   *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005) (holding that, in light of the fact that the need for medical care was obvious, *Blackmore* established that the plaintiff "need not prove that the officers' acts or omissions were the proximate

11

cause of [the] death in order to hold the officers liable").  Whether presented as a *Farmer* "serious medical need" claim or a *Blackmore* "delay of treatment" claim, in the case of an obvious medical condition, the "obviousness" inquiry is the same, *i.e.* it will be deemed "sufficiently serious" if it is "one that is so obvious that even lay person would easily recognize the necessity for a doctor's attention."  *Lockett v. Suardini*, 526 F.3d 866, 876 (6th Cir. 2008).

To satisfy the subjective criterion, the plaintiff must demonstrate that "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703. It is not enough for the plaintiff to allege that the officer should have recognized a serious medical risk existed. *See Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."). Recklessly disregarding a known medical risk satisfies this requirement. *Id*. at 839-40.  Although the subjective component requires a finding of something more blameworthy than negligence, "it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*. at 835. "Because government officials do not readily admit the subjective component of this test, it may be demonstrat[ed] in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Dominguez v. Correctional Medical Servs.*, 555 F.3d 550 (6th Cir. 2009) (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)).

In the individual capacity analysis, the Court examines Plaintiff's claims against each Defendant independently.  The Sixth Circuit has instructed that "the subjective component of a

deliberate indifference claim must be addressed for each officer individually." *Phillips*, 534 F.3d at 542 (quoting *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)) (quotation marks and brackets omitted).

### 1.    Deputy Van Woert

The Court concludes that Deputy Van Woert is entitled to qualified immunity on Plaintiff's claim that she was deliberately indifferent to Goode's serious medical need.  Although ultimately, as discussed *infra*, Goode did exhibit obvious signs of a serious medical condition, at the time that Van Woert observed Goode, his signs and symptoms were not sufficient to put a lay person on notice that he was in need of immediate medical attention, thus the objective component of the deliberate indifference inquiry cannot be satisfied with respect to Van Woert.  Even assuming sufficient evidence of the objective component, there is no evidence to support a finding of the subjective component, *i.e.* that Van Woert perceived facts from which to infer a serious risk to Goode's health, that she drew that inference and that she disregarded that risk.

The evidence, viewed in the light most favorable to Plaintiff, and permitting Plaintiff all reasonable factual inferences drawn from that evidence, reveals that Deputy Van Woert observed Goode walking back toward his cell after taking a shower and was informed that Goode was feverish and would be unable to perform his afternoon shift housing worker duties.  Plaintiff attempts to contradict Deputy Van Woert's testimony that she observed Goode return to his cell after his shower, by suggesting that her testimony is contradicted by Deputy Alfarno's testimony (who came on the shift *after* Van Woert's shift) that he also witnessed Goode after his shower (at approximately 2:50, *see* Alfarno Dep. 20) and in fact asked Goode if he needed medical attention, which Goode declined.  Plaintiff suggests the inference that Van Woert must not yet have arrived on scene because

13

Alfarno was still on duty and therefore Van Woert could not have witnessed Goode coming out of the shower.  While Plaintiff is entitled to all reasonable inferences from the facts, in this instance the inference Plaintiff suggests is simply not reasonably inferred from the evidence.  There is no evidence to rebut the testimony of each of the deputies, Alfarno, Van Woert and Berlanga, that at the time of the shift change, shortly before and shortly after 3:00 p.m., each was present in the area and each observed Plaintiff walk back to his cell from his shower.  Indeed, common sense suggests that at the time of a shift change, there would be such overlap of personnel.  None of the deputies has testified that the other two were not present when Goode exited the shower.  Van Woert specifically remembers that when she observed Goode walking back to his cell from the shower he "looked perfect," and "wasn't staggering, throwing up, nothing out of the ordinary."  Van Woert Dep. 43-44.  Accordingly, the Court must accept as unrebutted Deputy Van Woert's testimony that she did see Jesse Goode, somewhere around 3:00 p.m., emerge from the shower and return to his cell.  Also unrebutted is Deputy Van Woert's testimony that she left the floor shortly thereafter and did not hear Howard inform Berlanga that Goode was "feverish," only that Goode was "not feeling well" and wanted to lie down.  Although Berlanga testified that he believed that Van Woert heard Howard say this, Berlanga's testimony as to what Deputy Van Woert heard cannot reasonably dispute her testimony that in fact she did not hear Howard when he stated that Goode had a fever.  While we must view the facts in the light most favorable to the Plaintiff, the facts so taken must have some basis in admissible evidence.

Even if Deputy Van Woert was aware of the additional fact that Goode was reportedly feverish, knowledge of this additional fact would be insufficient to establish that Deputy Van Woert had been made aware that Goode was suffering form a serious medical condition that demanded

14

immediate attention.  As Deputy Alfarno's testimony suggests, a more conscientious deputy may have followed up after learning that an inmate had a fever.  However, it is common knowledge that fevers occur for a multitude of reasons and the fact that an inmate, one who has just been observed casually walking back to his cell after taking a shower, was known to be feverish and was not feeling well enough to attend to his afternoon dinner duties, does not present a condition so obvious that even a lay person would consider it a  "serious medical condition" that demands immediate attention.  *See, e.g. Ford v. LeMire*, No. 03-10176, 2004 WL 1234137, at \*5 (E.D. Mich. June 1, 2004) (finding that complaints of minor discomfort and fever associated with a spider bite were not indicative of a serious medical condition and did not establish a material question of fact on the objective component of plaintiff's deliberate indifference claim).  These facts would not alert "even a lay person" to the fact that immediate medical attention is needed.  Under these circumstances, the facts of Goode's fever and missed shift fail to satisfy the objective component of the deliberate indifference inquiry, *i.e.* they do not, in and of themselves, indicate a serious medical condition which even a lay person would deem demanded immediate medical attention. [3]

Nor can Plaintiff satisfy the subjective component of the deliberate indifference test as to deputy Van Woert, who at most knew that Goode was not "feeling well," perhaps had a fever and would miss his dinner duty shift.  Shortly after becoming aware of these facts, Van Woert left the floor to work in booking, leaving Deputy Berlanga in charge of Goode's pod.  Although it was later

---

[3]  Although Plaintiff does not articulate the specific nature of the deliberate indifference claim against Van Woert, any suggestion that the objective component of the claim against Van Woert can be satisfied under a *Napier* delay of treatment theory would require validating medical evidence of the effect of the delay. The Court need not address this issue, however, because, as discussed *infra*, Plaintiff cannot establish the subjective component of the deliberate indifference test as to Van Woert, entitling Van Woert to qualified immunity in any event.

determined that Goode was in fact suffering from a serious medical condition, Van Woert's subjective mental state is determinative of her entitlement to qualified immunity and nothing suggests that she "perceived facts from which to infer substantial risk to the prisoner, that [s]he did in fact draw the inference, and that [s]he then disregarded that risk." *Comstock*, 273 F.3d at 703. It is not enough for the plaintiff to allege that the officer should have recognized a serious medical risk existed. *See Farmer*, 511 U.S. at 838, 114 S.Ct. 1970 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."). *See also Kosloski v. Dunlap*, 347 F. App'x 177, 180 (6th Cir. 2009) (concluding that isolated complaints of fever and vomiting did not give jail nurse reason to believe that inmate suffered from a serious medical condition despite the fact that he was in fact suffering from endocartitis, a serious medical condition); *Weaver v. Shadoan*, 340 F.3d 398, 410-11 (6th Cir. 2003) (noting that it is not sufficient for a plaintiff to allege that officers *should* have known that a suspect had ingested drugs where "'the situation did not involve an incapacitated detainee or one who asked for but was refused medical treatment'") (quoting *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001)); *Meier v. County of Presque Isle*, 376 F. App'x 524, 530 (6th Cir. 2010) (finding that jail personnel who knew that inmate had blood alcohol of .30 and was not feeling well were not deliberately indifferent for failing to seek medical attention even though in hindsight different action "would have been preferable," noting that "the law does not require the best, or even the better, course [but] only requires that the course taken not be reckless") (alteration added).

Plaintiff relies on *Dominguez v. Correctional Medical Servs.*, 555 F.3d 543 (6th Cir. 2009), where the Court found evidence of deliberate indifference in the conduct of a nurse who ignored

multiple reports of symptoms related to an episode of heat stroke.  However, the reported symptoms of which the jailers initially were aware in *Dominguez*, including knowledge that Plaintiff had been exposed to excessive heat during an hour and a half weight training session, become dehydrated and exhibited a "wobbly" demeanor and inability to shower alone, were far more extensive than the report of an isolated fever in an inmate who had just moments before been observed exiting the shower and walking back to his cell and refusing medical treatment.

It is undisputed that shortly after beginning her 3:00 p.m. shift, and at the latest by approximately 3:15 p.m., Van Woert left the floor and went down to booking and did not return to the floor until the Code Blue was called at approximately 4:30 p.m.  Van Woert Dep. 23.  Based on the condition and symptoms that Van Woert observed, no reasonable juror could conclude that she subjectively perceived facts that would indicate a substantial health risk to Goode, that she drew the inference that he was seriously ill and then disregarded that risk.  For this reason, Deputy Van Woert, cannot be said to have been deliberately indifferent to a serious medical need and she is entitled to qualified immunity.

## 2.      Deputy Berlanga

The qualified immunity analysis as to Deputy Berlanga is more complicated.  Viewing the facts in the light most favorable to the Plaintiff, Berlanga was informed by Goode's fellow inmate DeShawn Howard that Goode was lying in his bunk, did not "look good," was making gurgling noises and foaming at the mouth.  Pl.'s Resp. Exs. 3, 19; Ex. 2, Berlanga Dep. 48.  Any lay person, armed with these facts, would instantly understand that the individual was suffering from a serious medical condition and was in need of immediate medical attention.  *Blackmore*, 390 F.3d at 899.  While Deputy Berlanga insists that he immediately jumped up after learning these facts from

17

Howard and attended to Goode, this claim is directly contradicted by the sworn affidavit testimony of Goode's fellow inmates, Eric Loften and Richard Short, both of whom testify consistently that Howard had to go back to Berlanga twice with this information before Berlanga finally went to check on Goode, a delay that is claimed to have been somewhere between 5 and 7 minutes.  Pl.'s Resp. Exs. 3, 19.  Viewing the facts in the light most favorable to the Plaintiff, a reasonable juror could conclude that Berlanga subjectively perceived facts that would indicate a substantial health risk to Goode, that he drew the inference that he was seriously ill and then disregarded that risk by not immediately responding to Goode's fellow inmates pleas for assistance.  "Because government officials do not readily admit the subjective component of this test, it may be demonstrat[ed] in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Dominguez*, 555 F.3d at 550.  Plaintiff has created a genuine issue of material fact as to both the objective and subjective components of the deliberate indifference analysis with respect to Berlanga, depriving Berlanga of the defense of qualified immunity.

Berlanga counters these facts, which he must credit as true for purposes of his qualified immunity argument, by stating that even if he did delay in tending to Goode after learning of his serious medical condition, Plaintiff has failed to produce medical evidence that this delay was the cause of Goode's death.  However, in this circumstance, the Sixth Circuit has clearly held, no such evidence need be produced.  "[W]here a plaintiff's claims arise from an injury or illness so obvious that even a layperson would easily recognize the necessity for a doctor's attention, the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed treatment, his medical condition worsened or deteriorated.  Instead, it is sufficient to show that he actually

experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Blackmore*, 390 F.3d at 894. Accordingly, Plaintiff's failure to come forward with definitive expert testimony indicating that had Narcan been administered several minutes sooner, Goode's life would have been saved, does not entitle Deputy Berlanga to qualified immunity. Viewing the facts in the light most favorable to the Plaintiff, Deputy Berlanga learned facts establishing that Goode was experiencing a serious medical condition that demanded immediate medical attention. If Berlanga waited 5-7 minutes to respond under the circumstances of this case, a reasonable juror could conclude that he failed to address that serious medical need in a reasonable period of time, and thereby exhibited deliberate indifference to Goode's serious medical need. The Court concludes, therefore, that Deputy Berlanga is not entitled to qualified immunity.

### 3.    Sergeant Nuckolls

The Code Blue was called at approximately 4:25 p.m. according to the prison health records (Pl.'s Resp. Ex. 7) or approximately 4:30 p.m. according to Nurse Thomas's Affidavit (Pl.'s Resp. Ex. 9, Thomas Aff. ¶ 2). The EMS report indicates a unit was dispatched to the jail at 4:36 p.m. (Pl.'s Resp. Ex. 8) and Plaintiff claims that the call for paramedic help was initiated at 4:33 p.m. (Pl.'s Supp. Br. at 5.) This time frame is consistent with the Affidavit testimony of Nurse Thomas, the first to respond to the Code Blue, who testified that she arrived at Goode's cell at approximately 4:00 p.m. and asked deputies "in a forceful voice more than six times" to call 911 before 911 was finally called. (Pl.'s Resp. Ex. 9, Thomas Aff. ¶ 5.) Nurse Thomas estimated that it was approximately seven minutes between the time jail personnel responded to the Code Blue and the time that paramedics were called. *Id.* ¶ 6.

The claim against Sergeant Nuckolls is that he was deliberately indifferent for failing to timely call 911. (Pl.'s Supp. Br. at 6.) However, it is undisputed that Sgt. Nuckolls twice requested that 911 be called – once when he received the call from Sgt. Guest while Nuckolls was still down in booking and again after he arrived at Goode's cell. In his answer to interrogatories, Nuckolls stated that he received a radio call frm Sgt. Guest requesting that he (Nuckolls) call 911 and that he did in turn contact the control room and request that 911 be called. (ECF No. 88-7, Nuckolls's Answers to Interrogatories, No. 12, pp. 4-5; ECF No. 88-8, Nuckolls Dep. 9-10.) Further evidence that Nuckolls placed this first call to 911 at the time the Code Blue was called is also found in the prison health records which indicated that a Code Blue was called at 16:25 and that Sgt. Nuckolls called for an ambulance "while en route" to the location of the code blue. ECF No. 88-18, p. 1. Plaintiff presented no evidence to dispute that Nuckolls requested this first call to 911 at the time the Code Blue was called.

After making the first request for a 911 call, Nuckolls then proceeded to Goode's cell and placed a second call to the control room to contact 911. Nuckolls Dep. 11. This testimony is undisputed and is not inconsistent with Nurse Thomas's Affidavit. Nurse Thomas states that she asked "deputies" more than six times to call 911. ECF No. 92-1, Thomas Aff. ¶ 5. Nurse Thomas did not indicate when Nuckolls arrived at the cell nor does she claim that she asked Nuckolls more than six times to call 911. Her only reference to Nuckolls specifically is that he asked for the defibrillator cart to be brought into the cell after several minutes. *Id.* ¶ 8. It is unclear whether the control room followed Nuckolls first request to call 911, but it is undisputed that he made such a call and that he proceeded to Goode's cell *after* he made that call and made a second call. Nuckolls Dep. 12. Nurse Thomas would have been unaware that this first call had been made and thus her

testimony that it was several minutes before 911 was called would have related to the second call to 911. Even viewing the facts in the light most favorable to the Plaintiff, these facts do not support a claim that Sgt. Nuckolls was aware of a substantial risk to Goode's health, that he perceived that risk and that he ignored that risk. The undisputed evidence establishes that immediately after receiving the radio call from Sgt. Guest, Nuckolls contacted control and requested that 911 be called. Accordingly, Plaintiff has failed to create a genuine issue of material fact that Sgt. Nuckolls violated Goode's Eighth Amendment rights. Nuckolls therefore is entitled qualified immunity and to summary judgment on Plaintiff's claim of deliberate indifference.

### B.   Policy Claims Against the County

A municipality can be held liable under § 1983 where it is shown that a municipal custom or policy is the driving force behind the alleged constitutional violation. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (stating that the drafters of § 1983 intended only to impose liability on a government that "causes" an employee to violate another's rights under color of some official policy). "A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers." *Blackmore*, 390 F.3d at 900 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). To prevail in such a suit, the plaintiff must show that the alleged violation of his federal rights was caused by a municipal policy or custom. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). A plaintiff asserting a § 1983 claim on the basis of municipal custom or policy must identify the policy, connect the policy to the municipality, and show that the specific injury at issue was caused by the execution of that policy. *Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004). The causal link must be strong enough to support a finding that the defendants' deliberate conduct can be deemed the "moving force" behind the

21

violation.  *Id.* (quoting *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)).

In *Thomas*, the Sixth Circuit identified four ways a plaintiff may prove the existence of an illegal policy or custom.  398 F.3d at 429.  The plaintiff can point to (1) the government's legislative enactments or official policies; (2) actions by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom or practice of tolerating the violation of federal rights by its officers or agents.  *Id.*  Thus, to state a claim against Genesee County, Plaintiff must identify official policies, actions of officials with final decision-making authority, a policy of inadequate training or supervision, or a custom or practice of tolerating the violation of federal rights.  Where no formal written policy exists, the critical inquiry is whether there is a policy or custom that although not explicitly authorized "is so permanent and well settled as to constitute a custom or usage with the force of law."  *Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010) (quoting *McClendon v. City of Detroit*, 255 F. App'x 980, 982 (6th Cir. 2007)).  A municipality cannot be held liable pursuant to 42 U.S.C. § 1983 on a theory of *respondeat superior*. *Monell*, 436 U.S. at 691-95; *Phillips*, 534 F.3d at 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

If seeking to hold a municipality liable on a failure to train theory, the plaintiff must prove that: (1) the training or supervision was inadequate for the tasks the officer or employee was performing; (2) the inadequate training resulted from the defendant's deliberate indifference; and (3) the inadequacy was closely related to or caused the injury.  *Ellis v. Cleveland Municipal School Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely

to cause injury." *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010) (quotation marks and citations omitted). *See also Burgess v. Fischer*, 735 F.3d 462, 478-79 (6th Cir. 2013) (finding that plaintiff failed to demonstrate the existence of prior instances of similar misconduct demonstrating that the defendant was on notice that its training and supervision in the particular area being challenged was deficient); *Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) ("'To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the [employer] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'") (quoting *Miller*, *supra*) (alteration in original); *Hearon v. City of Ferndale*, No. 11-14481, 2013 WL 823233, at *16 (E.D. Mich. March 6, 2013) (finding that plaintiff failed to establish deliberate indifference where there was no evidence of prior instances of unconstitutional conduct demonstrating that the City had "ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury"). Where failure to train and supervise claims are not couched as part of a pattern of unconstitutional practices, "a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982) (internal citations omitted).

"[L]iability can arise and deliberate indifference can [also] be shown by proof that the city or county 'knows that inmates face a substantial risk of serious harm and disregards the risk by failing to take reasonable measures to abate it.'" *Blackmore*, 390 F.3d at 900 (quoting *Farmer*, 511 U.S. at 847). In *Blackmore*, the Sixth Circuit found that the county's complete absence of a policy

on how to deal with prisoner illness and its practice of not requiring an on-duty nurse at all times created a question of fact regarding whether the harm suffered by the plaintiff resulted from the absence of an adequate policy or practice. *Id*.

Plaintiff identifies three potential "policies" that she asserts support her claim of municipal liability: "[T]he Estate's complaints against Genesee County include policy, practice and custom on [1] calling a medical code, [2] that deputies did not perform cell checks on a timely basis and lastly [3] inadequately enforcing a policy to strip search inmates coming back from work release to prevent drugs from coming into the jail and lack of a policy on cell shakedowns to stop drugs and their usage in the jail." Pl.'s Resp. 20. Plaintiff's claims appear to rely on two of the four paths to proving a policy claim identified in *Thomas*: (1) Plaintiff claims that the County had policies (or failed to have policies in place) that were the moving force behind Plaintiff's death and/or (2) that the County failed to train its officers on the policies that it did have in place.

First, any claim based upon a failure to train must fail because Plaintiff has offered no proof that other instances of unconstitutional conduct based upon the same policies (or absence of policies) have occurred and been ignored by the County. This is a critical element of a failure to train claim. *See Sanilac County*, 606 F.3d at 255; *Burgess*, 735 F.3d at 478-79 (finding that plaintiff failed to demonstrate the existence of prior instances of similar misconduct demonstrating that the defendant was on notice that its training and supervision in the particular area being challenged was deficient); *Savoie*, 673 F.3d at 495 ("'To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the [employer] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'") (quoting *Miller*, *supra*) (alteration in original); *Hearon*, 2013 WL 823233, at *16

24

(finding that plaintiff failed to establish deliberate indifference where there was no evidence of prior instances of unconstitutional conduct demonstrating that the City had "ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury").   Thus, Plaintiff is left with her claim that a policy, or the absence of a policy, was the moving force behind the constitutional violations she alleges.   Plaintiff must demonstrate that the claimed custom or policy is the driving force behind the alleged constitutional violation.   *See Monell*, 436 U.S. at 694 (stating that the drafters of § 1983 intended only to impose liability on a government that "causes" an employee to violate another's rights under color of some official policy).

### 1.      The medical code policy.

There is no dispute that the jail has a policy regarding procedures for addressing an event of serious injury or death that provides that staff shall: (1) examine for signs of life and injury; (2) begin resuscitation; (3) request medical assistance; (4) secure the scene; and (5) notify the shift commander.   The policy further defines the procedures for staff to follow in the event of a medical emergency, including notifying central control indicating location, briefly describing the problem and requesting a Code Blue in the event of certain conditions including loss of consciousness or breathing difficulty.   The Code Blue requires (1) staff to continue life saving procedures until health care staff arrive, (2) responding RN to immediately report and provide treatment; (3) a Sergeant to report to the scene, (4) RN to determine need for hospitalization and ambulance and to advise Sergeant that ambulance is needed, (5) Sergeant to call County Radio for ambulance and (6) shift commander to meet ambulance at designated entrance.   (Defs.' Mot. Ex. 14.)   Thus, there is no dispute that the County had a policy in place to address the very situation faced when Deputy

Berlanga found Goode unresponsive in his cell on the afternoon of April 16, 2011. Plaintiff does not attack the efficacy of this policy, has not established a failure to train on this policy, and thus cannot sustain a municipal liability claim based upon the medical code policy.

>    **2.    The cell check policy.**

A "cell check" in the context of this action means a routine check that entails looking in on inmate from outside the cell to be sure they are breathing, not in distress and that everything appears "normal." (Alfarno Dep. 10-11.) This is to be distinguished from a "shakedown" cell check, which is performed less frequently than the routine cell check, and involves actually entering the inmate's cell to check for contraband. Plaintiff appears to claim that the routine cell or "floor" check policy, which required cell checks to be performed every hour, was constitutionally inadequate, that the training the officers received on the cell check policy was inadequate, and/or that the officers were not performing cell checks according to the policy and that one or all of these failures was the moving force behind Goode's death.

In support of her claim that the cell check policy was the moving force behind Goode's death, Plaintiff submits the expert opinion of Dr. Jeffrey A. Schwartz, Ph.D. (Pl.'s Resp. Ex. 23, January 25, 2013 Report of Dr. Jeffrey A. Schwartz.) Dr. Schwartz is offered as an expert on jail policies and procedures and Defendants have not challenged either his qualifications or the substance of his opinion other than to state that it is "hearsay." Indeed, it is unclear whether Defendants ever availed themselves of the opportunity to depose Dr. Schwartz and they have not submitted an expert report of their own. Although the Defendants have not challenged Dr. Schwartz's Report through a formal motion, it is still incumbent on the Court to ensure that his testimony both rests on a reliable foundation and is relevant to the task at hand. *Daubert v. Merrell*

26

*Dow Pharm., Inc.*, 509 U.S. 579, 597 (6th Cir. 1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

Dr. Schwartz offers the opinion that the policy requiring cell checks only every hour was "unusual" although "not unheard of." Schwartz Rep. 10. Dr. Schwartz offers the opinion that "most jails and prisons require cell checks every fifteen to forty-five minutes, on a slightly irregular schedule to prevent inmates from timing those checks." *Id*. In this case, however, it is undisputed that Deputy Berlanga did perform a cell check of Goode's cell at 4:15 p.m., just fifteen minutes before the Code Blue was called. At that time, Deputy Berlanga did not enter the cell but observed Goode to be "sleeping like everybody else." Berlanga Dep. 41. Plaintiff does not dispute that Berlanga performed this check, although Plaintiff questions the adequacy of the check. Thus, even assuming that the policy was deficient based upon the frequency with which the jail staff were required to perform cell checks, there is no dispute that in this case a cell check was performed just 15 minutes prior to the Code Blue and thus the policy, even if defective, was not the "moving force" behind the alleged constitutional violation in this case.

**3.    Policies aimed at discovering contraband.**

Plaintiff claims that the County lacked sufficient policies and/or failed to properly train the officers on the execution of policies directed toward controlling the flow of contraband (illegal drugs in specific) into the jail. Any failure to train claim fails for the reasons discussed *supra* in section IIIB. Plaintiff has failed to create a genuine issue of material fact that any of the policies aimed at discovering contraband were the moving force behind Goode's death.

**a.    Searching inmates returning from work release.**

The County policy specifically required that "inmates leaving the Jail security perimeter will

27

be searched upon return." (Def.'s Resp. Ex. 14, Searches and Contraband, Policy at 1.) The Policy has a definite escalation of the permissible extent of a search, from a clothed search to an unclothed search and finally a body cavity search, of an inmate based on a number of criteria. Plaintiff has offered no competent evidence to contradict the testimony of the officers that this policy is in place and that it is enforced by them on a routine basis on inmates returning from leave. (Defs.' Mot. Alfaro Dep. 8-13, Pritchard Dep. 11-12, Van Woert Dep. 10, Nuckolls Dep. 8-9.) Strip searches, in particular, are only permitted under the Policy when there is probable cause to believe that an inmate possesses contraband or after a contact visit. (Policy at 1.) While Plaintiff's expert opines that strip searches should be routine on a returning inmate, even if true Plaintiff has presented insufficient evidence on which a reasonable juror could conclude that a strip search would have uncovered the drugs that Goode ingested on the date of his death. There is no evidence beyond speculation establishing from whom Goode received the drugs or how the drugs came into the jail. Thus, again, there is no evidence beyond mere speculation that an inadequate strip search policy on returning inmates was the moving force behind the alleged constitutional violation in this case.

**b.   Cell shakedown policy.**

The County also had a policy regarding interior cell searches which were randomly conducted during the first and second shifts of the day. (Policy at 5.) The Officers testified that they were trained on these interior cell searches and conducted them as part of their regular duties. (Defs.' Mot. Alfaro Dep. 8-13, Pritchard Dep. 11-12, Van Woert Dep. 10, Nuckolls Dep. 8-9.) Plaintiff's expert reviewed certain County records that allegedly demonstrate that these shakedown searches were not conducted on a regular basis and that contraband came into the jail on inmates returning from leave. First of all, this claim sounds in "failure to train," which cannot be established

28

absent evidence of prior instances in which the County was made aware of constitutional violations resulting from the lack of proper enforcement of the policy which the County ignored. As discussed *supra* in section IIIB, no such evidence has been presented here. Second, the interviews on which Plaintiff's expert relied are unsworn hearsay statements and not reliable evidence on which to base an expert opinion. In any event, Plaintiff offers no evidence on which a reasonable juror could conclude that had the officer's conducted more routine searches, the illegal drugs that were ingested by Goode on the date of this death would have been discovered and Goode's death prevented. Plaintiff has failed to create a genuine issue of material fact that the cell shakedown policy was the moving force behind Goode's death.

### C.     Gross Negligence Against Berlanga, Van Woert and Nuckolls

Plaintiff's response to Defendants' motion to dismiss states that "Plaintiff had counts of gross negligence against the three individuals, Deputies Berlanga, VanWoert and Nuckolls." ECF No. 92, Pl.'s Resp. 18.) To sustain a gross negligence claim, Plaintiff must present evidence that the defendant was grossly negligent, *i.e.* engaged in conduct that was "so reckless as to demonstrate a substantial lack of concern for whether injury results," and that the gross negligence is the proximate cause of the injury or damage. Mich. Comp. Laws § 691.1407(2). Evidence of ordinary negligence does not create a genuine issue of material fact on the issue of gross negligence. *Love v. Detroit*, 270 Mich. App. 563, 565 (2006). "Gross negligence involves 'almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks. It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge.'" *Lambert v. Green Oak Twp. Police Dept.*, No. 297088, 2011 WL 1815385, at *10 (Mich. Ct. App. May 12, 2011) (quoting *Tarlea v. Crabtree*,

263 Mich. App 80, 90; 687 NW2d 333 (2004)).

The phrase "the proximate cause" as used in the statute means "the one most immediate, efficient, and direct cause preceding an injury." *Robinson v. City of Detroit*, 462 Mich. 439, 458-59 (2000). The Michigan Court of Appeals has observed that where the defendant's conduct is "but one cause" among many, it cannot be the "one most immediate, efficient and direct cause" as required by *Robinson*. *Hartzell v. City of Warren*, No. 252458, 2005 WL 1106360, at *16 (Mich. Ct. App. May 10, 2005). However, in *Dominguez, supra*, the Sixth Circuit found that Michigan's governmental immunity statute was not fatal to a claim of gross negligence against a prison nurse where the inmate had exercised to exhaustion (clearly *a* proximate cause of his heat stroke) and the defendant nurse failed on multiple opportunities to provide adequate medical care to address his medical needs which ultimately resulted in his paralysis. Although the decedent's exercising in the heat was a proximate cause of his quadriplegia, the nurse's failure to provide adequate medical care after the inmate had ceased his exercise, and when an opportunity to provide medical care still presented itself, precluded summary judgment on Plaintiff's gross negligence claim. Specifically, the Sixth Circuit held:

> We find that Michigan's immunity statute is not fatal to Dominguez's state law claim. Based on the facts of this case, we are unable to conclude that Fletcher's actions were not the proximate cause of Dominguez's injury. Unlike the scenario in Robinson, where reckless drivers were still involved in the activity at the time of the injury, Dominguez's health continued deteriorating long after he ceased exercising. Rather, after feeling dizzy he repeatedly sought medical help from Fletcher. In fact, Fletcher had multiple opportunities to provide adequate medical care and to, *in all likelihood*, prevent Dominguez's injuries. As such, this Court affirms the district court's decision that Fletcher is not entitled to summary judgment on Dominguez's gross negligence claim under Michigan law.

555 F.3d at 553 (emphasis added). *Dominguez* seems to suggest that if the earlier possible cause has ceased to operate, the failure to provide adequate care can be "the one most immediate, efficient,

and direct cause."  And, as the highlighted language intimates, it need not be established with certainty that intervention would have prevented the resulting injury.

For the reasons discussed *supra*, the evidence, even viewed in the light most favorable to the Plaintiff, does not create a genuine issue of fact that either Van Woert or Nuckolls was grossly negligent in this case.  Van Woert was at most negligent for not following up after allegedly learning that Goode was running a fever and Nuckolls immediately placed a call to 911 when he was informed of the Code Blue.  Again, however, the analysis is different with regard to Deputy Berlanga.  In this case, given the affidavit testimony of fellow inmates Short and Lefton (Pl.'s Resp. Exs. 3, 19), a reasonable juror could conclude that Berlanga's five to seven minute delay in attending to Goode, after having been notified that Goode was in obvious distress, foaming at the mouth and making gurgling sounds, was the proximate cause of Goode's death despite the fact that Goode's ingestion of heroin was the initial cause of his distress.  Plaintiff presented the testimony of Daniel McCoy, which was equivocal on the ultimate conclusion that an earlier administration of Narcan would have saved Goode's life.  McCoy's testimony was clear, however, that had Goode received the Narcan earlier, he would have had a greater probability of surviving.  (Pl.'s Resp. Ex. 22, April 26, 2013 Deposition of Daniel J. McCoy 62.)  Defendants presented no summary judgment evidence to rebut or contradict McCoy's testimony.  *Dominguez* suggests that Plaintiff need not establish beyond question that intervention would have resulted in a different outcome, only that a different outcome was likely.  Here, as in *Dominguez*, there is evidence, although short of a medical certainty, supporting a reasonable likelihood that a different outcome would have resulted had Berlanga immediately responded to Goode's obvious distress, allowing for an earlier administration of Narcan.  Accordingly, Berlanga is not entitled to summary judgment on Plaintiff's claim of gross

negligence under Michigan law. The gross negligence claims against Van Woert and Nuckolls are dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes: (1) that Van Woert and Nuckolls are entitled to qualified immunity and GRANTS their motions for summary judgment; (2) that Berlanga is not entitled to qualified immunity on Plaintiff's deliberate indifference claim and is not entitled to summary judgment on Plaintiff's gross negligence claim and DENIES Berlanga's motion for summary judgment; and (3) that Genesee County is entitled to summary judgment on each of Plaintiff's municipal liability claims.

Accordingly, Plaintiff's claims against Van Woert, Nuckolls and Genesee County are DISMISSED WITH PREJUDICE and the case proceeds to trial against Deputy Berlanga on Plaintiff's claims of deliberate indifference and gross negligence.

IT IS SO ORDERED.

s/Paul D. Borman_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 21, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 21, 2015.

s/Deborah Tofil_____
Case Manager